# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOSE GARZA, derivatively on behalf of CASSAVA SCIENCES, INC., | |
| Plaintiff, | Case No.: 1:24-cv-02725 |
| v. | |
| REMI BARBIER, ERIC J. SCHOEN, RICHARD J. BARRY, ROBERT Z. GUSSIN, MICHAEL J. O'DONNELL, SANFORD R. ROBERTSON, and PATRICK J. SCANNON, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| CASSAVA SCIENCES, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Jose Garza ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Cassava Sciences, Inc. ("Cassava" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Remi Barbier, Eric J. Schoen, Richard J. Barry, Robert Z. Gussin, Michael J. O'Donnell, Sanford R. Robertson, and Patrick J. Scannon (collectively, the "Individual Defendants" and with Cassava, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Cassava, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and for contribution against Defendants Barbier and Schoen under 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon,

*inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cassava, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.    This is a shareholder derivative action brought on behalf of Cassava against the Individual Defendants for wrongdoing committed between August 18, 2022 and October 12, 2023, both dates inclusive (the "Relevant Period").

2.    The Company is a biotechnology corporation incorporated in Delaware and headquartered in Austin, Texas. Cassava develops drugs for neurodegenerative diseases. The Company's top-performing therapeutic product candidate is "simufilam," which is designed to treat Alzheimer's disease. The Company's best investigational diagnostic product is "SavaDx," which is a blood-based diagnostic test that is used to detect Alzheimer's. Simufilam targets a protein in the brain, filamin A ("FLNA"), and reverts FLNA to a healthy conformation, combatting the effects of altered FLNA.

3.    Cassava claims that it gauges simufilam's effectiveness in restoring brain health by observing cerebrospinal fluid ("CSF") biomarkers. A biomarker is a measurable indicator that is used to determine whether a patient is impacted by a specific condition. To analyze CSF biomarkers, scientists at the Company would measure CSF levels before and after a patient took simufilam, anticipating that, upon taking simufilam, the affected individual's CSF levels would

decrease to a level similar to that of a patient without Alzheimer's disease. The Company began researching simufilam's effects on CSF biomarkers as early as March 2020.

4.  Although Cassava views simufilam as a game changer for the Company, the Company currently has no source of revenue. Therefore, the Company's overall financial success largely depends on obtaining regulatory approval for its lead products to get them to market.

5.  Criticism regarding the Company's research methods percolated in 2021. In August 2021, a Citizen Petition was filed with the U.S. Food and Drug Administration ("FDA") requesting that phase 3 trials of simufilam be paused due to data manipulation. The Citizen Petition referenced "grave concerns about the quality and integrity of the laboratory-based studies surrounding this drug candidate and supporting the claims for its efficacy."

6.  The criticism was directed especially at the methods of the Company's principal scientific advisor, Dr. Hoau-Yan Wang ("Dr. Wang") of City University of New York ("CUNY") Medical School, who had worked for fifteen years with the Company's scientists.

7.  Cassava denied the allegations and defended Dr. Wang's research and the effectiveness of simufilam. In a press release published shortly after the FDA received the Citizen Petition, the Company stated, "The Company stands behind its science, its scientists and its scientific collaborators."

8.  From August 18, 2022 onward, and throughout the Relevant Period, the Individual Defendants caused Cassava to make materially false and misleading statements to the investing public regarding the accuracy and reliability of data the Company used to support simufilam's efficacy. Specifically, Cassava defended its scientific data despite growing criticism that its data was the product of extensive scientific misconduct.

9. Cassava issued a press release on August 18, 2022, entitled, "No Evidence of Data Manipulation in Science Publication on Simufilam," claiming that "allegations of research misconduct are false" and that hopefully the "written pronouncements from neutral and independent science experts will help close the chapter of baseless attacks against out science."

10. Cassava continued to make similar statements defending the reliability of the Company's research data throughout the Relevant Period, defending the research methods of Dr. Wang and the evidence behind simufilam.

11. On October 12, 2023, the truth emerged when *Science,* a peer-reviewed academic journal, published an article entitled "Co-developer of Cassava's Potential Alzheimer's Drug Cited for 'Egregious Misconduct'" (the "*Science* Article"). The *Science* Article revealed that CUNY Medical School discovered evidence that Dr. Wang engaged in "deliberate scientific misconduct" involving twenty research papers, one of which was published in 2012 by Dr. Wang in *The Journal of Neuroscience*. This research paper, and others among the twenty similar research papers, were foundational to the Company receiving federal funding for the development of simufilam and informing the public of the potential benefits of simufilam.

12. The *Science* Article also uncovered that while CUNY requested the "original raw data" of Dr. Wang's research, Dr. Wang's research misconduct was so severe that he could not "turn over to the panel 'even a single datum or notebook in response to any allegations[.]"

13. Following this news, Cassava's stock price fell $2.68 per share, from $17.34 per share at market close on October 12, 2023, to $14.86 per share at market close on October 13, 2023, amounting to a 15.28% decline.

14. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing Cassava to make to the investing public a series of

materially false and misleading statements regarding Cassava's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused Cassava to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Cassava failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) as a result, Cassava's published data that supported simufilam's efficacy was susceptible to manipulation and had overstated simufilam's efficacy and simufilam's clinical and/or commercial prospects; (3) as a further result of the foregoing, Cassava was subject to high risks of substantial financial and reputational harm; (4) Cassava failed to maintain adequate internal controls; and (5) as a result all of the foregoing, Cassava's public statements were materially false and misleading at all times.

15.     During the Relevant Period, the Individual Defendants also solicited a materially false and misleading proxy statement on Schedule 14A that was filed with the SEC on March 27, 2023 (the "2023 Proxy Statement"). The 2023 Proxy Statement solicited shareholders to: (1) re-elect Defendants Barry and Gussin to the Board; (2) approve an amendment to Cassava's amended and restated certificate of incorporation to limit the liability of certain officers of Cassava; (3) approve the Non-employee Director Compensation Program (the "Compensation Program"); (4) approve Ernst & Young ("EY") as Cassava's independent registered public accounting firm for the fiscal year ending on December 31, 2023 (the "Fiscal Year 2023"); (5) approve, via non-binding advisory vote, the 2022 executive compensation of named executive officers; and (6) approve, via non-binding advisory vote, the frequency of non-binding advisory votes on the executive compensation of Cassava's named executive officers. According to a Form 8-K that Cassava filed with the SEC on May 8, 2023, all six solicitations were approved by shareholders.

16.     As a result of the materially false and misleading statements and omissions in the 2023 Proxy Statement, the Individual Defendants materially benefited from the shareholders approving the Compensation Program. The Compensation Program provided the non-employee Director Individual Defendants with the following material personal benefits: (i) a $10,000 annual retainer; (ii) an initial nonqualified stock option grant for the right to purchase 20,000 shares of Cassava's common stock; (iii) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares Cassava common stock; and (iv) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of Cassava's common stock for service on one committee or 5,000 shares of Cassava's common stock for service on two or more committees. Therefore, the 2023 Proxy Statement provided personal material benefits to Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon, all of whom are entitled to the payments provided for in the Compensation Program.

17.     The false and misleading statements throughout the Relevant Period and the false and misleading statements and omissions in the 2023 Proxy Statement induced the Company's shareholders to vote to approve the Compensation Program. Consequently, the Individual Defendants materially benefited from their scheme to cause Cassava to make false and misleading statements.

18.     The Individual Defendants further breached their fiduciary duties by failing to correct and/or causing Cassava to fail to correct these false and misleading statements and omissions of material fact. Additionally, in breach of their fiduciary duties, the Individual Defendants caused Cassava to fail to maintain adequate internal controls.

19.     As a result of the Individual Defendants' misconduct—which has subjected the

Company, its Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Illinois (the "Class Action"), and which has further subjected Cassava to the need to undertake internal investigations and implement adequate internal controls, and losses due to Cassava's overcompensation of the Individual Defendants —Cassava will have to expend many millions of dollars. Additionally, Cassava has been significantly damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20. As a result of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are Cassava's current directors, the collective engagement in fraud and misconduct by the Company's directors, the substantial likelihood of the directors' liability in this derivative action and of certain directors' and officers' liability in the Class Action, and the lack of disinterested or independent directors, a majority of Cassava's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of Cassava with the requisite level of disinterestedness and independence.

### *JURISDICTION AND VENUE*

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Class Action based on violations of the Exchange Act.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. In addition, the Company's principal executive offices are in this District.

## PARTIES

### Plaintiff

25.     Plaintiff currently holds Cassava common stock and has continuously held Cassava common stock since February 3, 2021.

### Defendant Remi Barbier

26.     Defendant Remi Barbier ("Barbier") is Cassava's President, CEO, and Chairman of the Board, and has served in all three roles since founding Cassava in May 1998. According to the 2023 Proxy Statement, as of March 16, 2023, Defendant Barbier owned 2,031,594 shares of Cassava's common stock, representing 4.8% of Cassava's outstanding common stock. Given that the price per share of Cassava's common stock at the close of trading on March 16, 2023 was $26.75, Defendant Barbier owned approximately $54 million worth of the Company's stock. For the fiscal year ended December 31, 2022 (the "Fiscal Year 2022"), Defendant Barbier received $1,114,998 in total compensation from Cassava.

### Defendant Eric J. Schoen

27.     Defendant Eric J. Schoen ("Schoen") has served as Cassava's CFO since October 2018. According to the 2023 Proxy Statement, as of March 16, 2021, Defendant Schoen owned

71,800 shares of Cassava's common stock. Given that the price per share of Cassava's common stock at the close of trading on March 16, 2023 was $26.75, Defendant Schoen owned approximately $1.9 million worth of the Company's stock as of that date. For Fiscal Year 2022, Defendant Schoen received $425,000 in total compensation from Cassava.

**Defendant Richard J. Barry**

28.     Defendant Richard J. Barry ("Barry") has served as a director of Cassava since June 2021. He also serves as the Chair of the Audit Committee and the Chair of the Nominating and Governance Committee. According to the 2023 Proxy Statement, as of March 16, 2023, Defendant Barry owned 275,000 shares of Cassava's common stock. Given that the price per share of Cassava's common stock at the close of trading on March 16, 2023 was $26.75, Defendant Barry owned approximately $7.3 million worth the Company's stock.

**Defendant Robert Z. Gussin**

29.     Defendant Robert Z. Gussin ("Gussin") has served as a director of Cassava since March 2003. He also serves as a member of both the Audit Committee and Compensation Committee. According to the 2023 Proxy Statement, as of March 16, 2023, Defendant Gussin owned 142,537 shares of Cassava's common stock. Given that the price per share of Cassava's common stock at the close of trading on March 16, 2023 was $26.75, Defendant Gussin owned approximately $3.8 million worth of the Company's stock.

**Defendant Michael J. O'Donnell**

30.     Defendant Michael J. O'Donnell ("O'Donnell") has served as a director of Cassava since June 1998. According to the 2023 Proxy Statement, as of March 16, 2023, Defendant O'Donnell owned 89,666 shares of Cassava common stock. Given that the price per share of

Cassava common stock was $26.75 at the close of trading on March 16, 2023, Defendant O'Donnell owned approximately $2.39 million worth of the Company's common stock.

**Defendant Sanford R. Robertson**

31.     Defendant Sanford R. Robertson ("Robertson") has served as a director of Cassava since September 1998. He serves as a member on each of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee. He also serves as Lead Director. According to the 2023 Proxy Statement, as of March 16, 2023, Defendant Robertson owned 1,161,694 shares of Cassava common stock. Given that the price per share of Cassava common stock was $26.75 at the close of trading on March 16, 2023, Defendant Robertson owned approximately $31 million worth of the Company's common stock.

**Defendant Patrick J. Scannon**

32.     Defendant Patrick J. Scannon ("Scannon") has served as a director of Cassava since December 2007. During the Relevant Period, he served on the Audit Committee. According to the 2023 Proxy Statement, as of March 16, 2023, Defendant Scannon beneficially owned 92,955 shares of Cassava common stock. Given that the price per share of Cassava common stock was $26.75 at the close of trading on March 16, 2023, Defendant Scannon owned approximately $2.48 million worth of the Company's common stock.

**Nominal Defendant Cassava**

33.     The Company is incorporated in Delaware and headquartered at 6801 N. Capital of Texas Highway, Building 1, Suite 300, Austin, Texas 78731. The Company's shares trade on the Nasdaq Capital Market ("Nasdaq") under the ticker "SAVA."

## *THE MISCONDUCT OF THE INDIVIDUAL DEFENDANTS*

34.     The Company operates as a biotechnology company with a product portfolio that includes simufilam, the lead therapeutic product candidate, and SavaDx, the lead investigational diagnostic product candidate. Simufilam is a treatment for Alzheimer's, and SavaDx is a test that is used to detect the presence of Alzheimer's, prior to the appearance of clinical symptoms.

35.     One of Cassava's larger competitors, a company called Biogen Inc. ("Biogen"), recently obtained approval from the FDA for its Alzheimer's treatment, Aduhelm. However, if given FDA approval, Cassava's simufilam is an appealing potential alternative to Aduhelm because simufilam is taken orally, rather than intravenously like Aduhelm. Additionally, simufilam is expected to be much cheaper than Aduhelm, which costs approximately $56,000 per patient per year.

36.     The Company is experiencing great pressure to get at least one, but ideally both of its lead product candidates to market, given that, according to the Cassava's most recent Form 10-Q filed with the SEC on November 7, 2023, the Company "ha[s] yet to generate any revenues from product sales" and "ha[s] an accumulated deficit of $359.9 million at September 30, 2023."

37.     Immediately preceding the start of the Relevant Period, Cassava was working to finalize the results of its simufilam Phase 2b clinical trials, while attempting to advance to Phase 3 of the FDA approval process. However, the science Cassava used to support its claims of simufilam's effectiveness was based on a series of papers from two coauthors, Dr. Wang of CUNY and Dr. Lindsay Burns of the Company. Although the clinical trials Cassava conducted allegedly showed simufilam's effectiveness, future analyses presented in a Citizen Petition to the FDA demonstrated that the data from these trials had been manipulated. According to the Citizen Petition, no other labs were able to confirm the Company's research regarding simufilam.

### *False and Misleading Statements*

38.    Cassava issued a press release titled "No Evidence of Data Manipulation in Science

Publication on Simufilam" on August 18, 2022 (the "August 18, 2022 Press Release"). The August

18, 2022 Press Release stated the following, in relevant part:

> Cassava [. . .] was recently informed by the *Journal of Prevention of Alzheimer's Disease* (JPAD) that there is no convincing evidence to support allegations of data manipulation in a 2020 paper on simufilam co-authored by the Company's personnel and its science collaborators.
>
> ***
>
> **"From the onset, I have said that allegations of research misconduct are false, and for good reason – I see no supporting evidence for the allegations," said Remi Barbier, President & CEO. "I'm hopeful that written pronouncements from neutral and independent science experts will help close the chapter of baseless attacks against our science. At some point it becomes irrational for our detractors to repeat over and over again the same old tired mantra of data manipulation."**
>
> ***
>
> A related investigation by academic authorities at The City University of New York (CUNY) is ongoing. Pending a public response from CUNY, both *Neurobiology of Aging* and *Journal of Neuroscience* previously issued an outstanding "expression of concern", which is a non-standardized type of editorial notice used by academic publishers to raise awareness to a possible problem, according to the Council of Science Editors (2012).

39.    Cassava issued a press release on November 7, 2022, titled "Cassava Sciences

Reports Third Quarter Financial Results for 2022 and Business Updates" (the "November 7, 2022

Press Release"). The November 7, 2022 Press Release quoted Defendant Barbier:

> The clinical development of oral simufilam for Alzheimer's disease continues to make headway[.] . . . We now have over 650 patients enrolled in our on-going Phase 3 studies of simufilam in Alzheimer's disease, up from 150 patients approximately six months ago. We also look forward to presenting new clinical data for simufilam from two other ongoing studies in Alzheimer's disease.

40.     Cassava issued a press release on January 24, 2023, titled "Cassava Sciences Announces Positive Top-Line Clinical Results in Phase 2 Study Evaluating Simufilam in Alzheimer's Disease." The press release stated the following, in relevant part:

> Cassava [. . .] today announced positive top-line Phase 2 results for simufilam, its oral drug candidate for Alzheimer's disease dementia. This was an open-label safety study with exploratory efficacy endpoints. The study enrolled over 200 patients with mild-to-moderate Alzheimer's disease (MMSE 16-26). Study participants were administered open-label simufilam tablets 100mg twice daily for 1 year or more. Endpoints were measured at baseline (study entry) and month 12.

> ***

> "I'm very excited about these 1-year data," said [Defendant] Barbier[.] "They add strength and determination to our goal of helping people fight Alzheimer's disease. Simufilam is an innovative drug candidate that we are developing methodically, one study at a time, and this open-label safety study served its purpose. Next up in 2023 are top-line clinical results of our Cognition Maintenance Study, which is a randomized, controlled trial."

41.     Cassava issued a press release on February 28, 2023, titled "Cassava Sciences Reports Full-year 2022 Financial Results and Operating Updates" (the "February 28, 2023 Press Release"). The February 28, 2023 Press Release quoted Defendant Barbier:

> Setting aside headwinds, 2022 was highlighted by positive developments with patient enrollment in our Phase 3 clinical studies of simufilam in Alzheimer's disease[.] . . . Over 1,000 patients with Alzheimer's are now enrolled in these two studies. By year-end 2023, we expect to reach our enrollment target of approximately 1,750 patients for the Phase 3 studies. Recently, we announced top-line results for an open-label study. In this study, over 200 mild-to-moderate Alzheimer's patients were treated with simufilam for a year. Simufilam was well-tolerated, 47% of patients improved on ADAS-Cog scores over 12 months and an additional 23% of patients declined less than 5 points on ADAS-Cog. I believe these are noteworthy trial results, even as I am keenly aware that the gold standard in Alzheimer's research requires results from randomized, controlled studies."

42.     Cassava filed its annual report for Fiscal Year 2022 on Form 10-K with the SEC (the "10-K 2022") on February 28, 2023. The 10-K 2022 was signed by Defendants Barbier, Schoen, Barry, Gussin, O'Donnell, Robertson, and Scannon. Attached to the 10-K 2022 were

signed certifications pursuant to the Sarbanes Oxley Act ("SOX") by Defendants Barbier and Schoen attesting to its accuracy, the disclosure of any material changes to Cassava's internal controls over financial reporting, and the disclosure of any and all fraud. Under the section titled "Overview," the 10-K 2022 stated, in relevant part:

> Cassava [. . .] is a clinical-stage biotechnology company based in Austin, Texas. Our mission is to detect and treat neurodegenerative diseases, such as Alzheimer's disease. Our novel science is based on stabilizing – but not removing – a critical protein in the brain. Our lead therapeutic drug candidate, simufilam, is being evaluated for the proposed treatment of Alzheimer's disease dementia in Phase 3 clinical studies.
>
> Over the past 10 years, we have combined state-of-the-art technology with new insights in neurobiology to develop novel solutions for Alzheimer's disease and other neurodegenerative diseases. Our strategy is to leverage our unique scientific/clinical platform to develop a first-in-class program for treating neurodegenerative diseases, such as Alzheimer's.
>
> ***
>
> Our scientific approach for the treatment of Alzheimer's disease seeks to simultaneously suppress both neurodegeneration and neuroinflammation. We believe our ability to improve multiple vital functions in the brain represents a new, different and crucial approach to address Alzheimer's disease.
>
> Our lead product candidate, simufilam, is a proprietary small molecule (oral) drug. Simufilam targets an altered form of a protein called filamin A (FLNA) in the Alzheimer's brain. Published studies have demonstrated that the altered form of FLNA causes neuronal dysfunction, neuronal degeneration and neuroinflammation. We are currently conducting a Phase 3 program with simufilam in patients with mild-to-moderate Alzheimer's disease dementia.
>
> We believe simufilam improves brain health by reverting altered FLNA back to its native, healthy conformation, thus countering the downstream toxic effects of altered FLNA. We have generated and published experimental and clinical evidence of improved brain health with simufilam. Importantly, simufilam is not dependent on clearing amyloid from the brain. Since simufilam has a unique mechanism of action, we believe its potential therapeutic effects may be additive or synergistic with those of other therapeutic candidates aiming to treat neurodegeneration.

43.     Regarding Cassava's scientific practices, the 10-K 2022 stated:

Our scientific approach is to treat neurodegeneration by targeting an altered form of a scaffold protein called FLNA. Through years of basic research, we and our academic collaborators identified FLNA as a structurally altered protein that enables both a neurodegeneration and a neuroinflammation pathway in the Alzheimer's brain. We have shown that the altered form of FLNA is pervasive in the Alzheimer's brain and undetectable in healthy control brains.

Using scientific insight and lab techniques, we believe we have elucidated this protein dysfunction. Through this work, we have produced experimental evidence that altered FLNA plays a critical role in Alzheimer's disease. We engineered a family of high-affinity, small molecules to target this structurally altered protein and restore its normal shape and function. This family of small molecules, including our lead therapeutic candidate, simufilam, was designed in-house and characterized by our academic collaborators.

Our lead therapeutic product candidate, simufilam, is a small molecule (oral) drug with a novel mechanism of action. The target of simufilam is altered FLNA, the brain protein we seek to stabilize. Importantly, since simufilam has a unique mechanism of action, we believe its potential therapeutic effects may be additive or synergistic with those of other therapeutic candidates aiming to treat neurodegeneration. We are currently conducting a Phase 3 program with simufilam in patients with mild-to-moderate Alzheimer's disease dementia.

Given the biopharmaceutical industry's challenging track record in Alzheimer's research, we believe there is an urgent need to consider innovative approaches to combat this disease. We believe our scientific approach may broaden the range of possible treatment approaches for this complex disease.

44.    The 10-K 2022 also boasted about Cassava's development team, reporting that "Our product development team is led by seasoned professionals with a proven track record of innovation in drug discovery and development, as well as substantial business expertise."

45.    Under the heading "Our Strategy," the 10-K 2022 maintained:

Our goal is to develop product candidates to diagnose and treat neurodegeneration, such as Alzheimer's disease. Key elements of our business strategy to achieve this mission include:

- building a lean company that is narrowly focused on developing innovative product candidates for Alzheimer's disease and other areas of neurodegeneration;

- validating our unique scientific approach with competitive research grants and publishing our scientific data in peer-reviewed journals;

- applying our development capabilities to advance our product candidates through clinical proof-of-concept studies and beyond;

- using our expertise and experience to continue to focus on discovering new indications and product candidates, validated by experimental evidence and leading experts in the field; and

- continuing to outsource preclinical studies, clinical studies and formulation development activities in order to allow more efficient deployment of our resources

46.     Cassava filed with the SEC the 2023 Proxy Statement on March 27, 2023. The 2023 Proxy Statement was solicited by Defendants Barbier, Barry, Gussin, O'Donnell, Robertson, and Scannon. The 2023 Proxy Statement asked shareholders to, *inter alia*: (1) re-elect Defendants Barry and Gussin to the Board; (2) approve an amendment to Cassava's amended and restated certificate of incorporation to limit the liability of certain officers of Cassava; (3) approve the Non-employee Director Compensation Program (the "Compensation Program"); (4) approve EY as Cassava's independent registered public accounting firm for Fiscal Year 2023; (5) approve, via non-binding advisory vote, the 2022 executive compensation of named executive officers; and (6) approve, via non-binding advisory vote, the frequency of non-binding advisory votes on the executive compensation of Cassava's named executive officers. According to a Form 8-K that Cassava filed with the SEC on May 8, 2023, all six solicitations were approved by shareholders.

47.     As a result of the materially false and misleading statements and omissions in the 2023 Proxy Statement, the Individual Defendants materially benefited from the shareholders approving the Compensation Program. The Compensation Program provided the non-employee Director Individual Defendants with the following material personal benefits: (i) a $10,000 annual retainer; (ii) an initial nonqualified stock option grant for the right to purchase 20,000 shares of Cassava's common stock; (iii) an annual nonqualified stock option grant at the annual stockholder

2024 and 2025 meetings for the right to purchase 5,000 shares Cassava common stock; and (iv) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of Cassava's common stock for service on one committee or 5,000 shares of Cassava's common stock for service on two or more committees. Therefore, the 2023 Proxy Statement provided personal material benefits to Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon, all of whom are entitled to the payments provided for in the Compensation Program.

48.     Indeed, over the following thirty-six months, Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon received the following compensatory benefits: (i) a $10,000 annual retainer; (ii) an initial nonqualified stock option grant for the right to purchase 20,000 shares of Cassava common stock; (iii) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Cassava common stock; and (iv) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of Cassava's common stock for service on one committee or 5,000 shares of Cassava's common stock for service on two or more committees. Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon are now collectively entitled to $150,000 and $245,000 in shares and options.

49.     The 2023 Proxy Statement stated the following regarding risk oversight:

> **One of the key functions of the Board of Directors is informed oversight of the risk management process**. The Board administers this oversight function directly through the Board of Directors as a whole, as well as through its standing committees that address risks inherent in their respective areas of oversight. Areas of focus include economic, operational, financial (accounting, credit, investment, liquidity and tax), competitive, legal, regulatory, cybersecurity, privacy, compliance and reputational risks, and risk exposures related to COVID-19. **The risk oversight responsibility of the Board of Directors and its committees is supported by the management reporting processes, which are designed to provide visibility to the Board of Directors and to the personnel who are responsible for**

*risk assessment and information about the identification, assessment and management of critical risks, and management's risk mitigation strategies.*

The Audit Committee is responsible for reviewing and discussing major financial risk exposures and the steps management has taken to monitor and control these exposures, including guidelines and policies with respect to risk assessment and risk management. *The Audit Committee also monitors compliance with legal and regulatory requirements and assists the Board of Directors in fulfilling its oversight responsibilities with respect to risk management.* The Compensation Committee assesses and monitors whether any of the compensation policies and programs has the potential to encourage excessive risk-taking.

*The Company believes this division of responsibilities is an effective approach for addressing the risks the Company faces and that the board leadership structure supports this approach*.

50.     The 2023 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2023 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting Cassava to issue false and misleading statements to the investing public, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder approval of the Compensation Program, which provided material benefits to Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon.

51.     The 2023 Proxy Statement was further materially misleading because it failed to disclose that: (1) Cassava failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) as a result, Cassava's published data that supported simufilam's efficacy was susceptible to manipulation and had overstated simufilam's efficacy and simufilam's clinical and/or commercial prospects; (3) as a further result of the foregoing, Cassava was subject to high risks of substantial financial and reputational harm; (4) Cassava failed to

maintain adequate internal controls; and (5) as a result all of the foregoing, Cassava's public statements were materially false and misleading at all times.

52.     Because of the material misstatements and omissions contained in the 2023 Proxy Statement, Cassava shareholders voted to: (1) reelect Defendants Barry and Gussin to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify EY as the independent auditor; and (3) approve on a nonbinding advisory basis, Fiscal Year 2023 compensation for Defendants Barbier and Schoen, and the Compensation Program, thereby providing material benefits to Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon who were engaged in the misconduct.

53.     Cassava issued a press release on May 1, 2023 titled "Cassava Sciences Reports Q1 2023 Financial Results and Operating Updates" (the "May 1, 2023 Press Release"). The May 1, 2023 Press Release quoted Defendant Barbier, in relevant part:

> In Q1 2023, we announced results of a one-year, open-label Phase 2 safety study of simufilam in over 200 patients with Alzheimer's disease[.] . . . The dataset for this study shows long-term safety for simufilam. Notably, the data also show differences in changes in ADAS-Cog scores in mild and moderate subgroups. ***We believe this is an encouraging result, as it clearly shows an improvement in ADAS-Cog over 1 year in mild patients taking simufilam that is well outside the expected range of historical placebo decline from numerous other studies***.

54.     The Company issued a press release on July 5, 2023 titled "Oral Simufilam Slowed Cognitive Decline in a Randomized Withdrawal Trial of Mild-to-Moderate Alzheimer's Disease" (the "July 5, 2023 Press Release"). The July 5, 2023 Press Release quoted Defendant Barbier:

> Patients started out taking open-label simufilam for 12 months prior to enrolling in the CMS[.] . . . CMS patients on placebo were, in effect, withdrawn from simufilam for 6 months. This placebo arm declined while the CMS arm randomized to simufilam improved. ***We believe the emerging separation of cognitive scores between these two arms represents a drug effect.***

55. The Company issued a press release on August 3, 2023 announcing the Company's Q2 2023 financial results (the "August 3, 2023 Press Release"). The August 3, 2023 Press Release quoted Defendant Barbier, in relevant part:

> In July 2023, we announced clinical results of a randomized controlled trial with oral simufilam in over 150 patients with Alzheimer's disease[.] . . . ***In this study simufilam treatment for 6 months slowed cognitive decline by 38% versus placebo over six-month in patients with mild-to-moderate Alzheimer's disease. In addition, oral simufilam continues to be safe, well-tolerated. We believe these clinical results are noteworthy.***

56. The statements contained in ¶¶ 38-45 and 53-55 were materially false and/or misleading and failed to disclose material adverse facts about Cassava's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) Cassava failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) as a result, Cassava's published data that supported simufilam's efficacy was susceptible to manipulation and had overstated simufilam's efficacy and simufilam's clinical and/or commercial prospects; (3) as a further result of the foregoing, Cassava was subject to high risks of substantial financial and reputational harm; (4) Cassava failed to maintain adequate internal controls; and (5) as a result all of the foregoing, Cassava's public statements were materially false and misleading at all times.

**The Truth Emerges**

57. *Science*, a peer-reviewed academic journal, published the *Science* Article on October 12, 2023. The *Science* Article revealed that an investigation into Dr. Wang's research at CUNY had ended:

> Cassava Sciences, a biotech company whose work on the experimental Alzheimer's drug simufilam has been heavily criticized and is the subject of ongoing federal probes, has suffered another blow. A much-anticipated investigation by the City University of New York has accused neuroscientist Hoau-Yan Wang, a CUNY faculty member and longtime Cassava collaborator, of scientific misconduct

involving 20 research papers. Many provided key support for simufilam's jump from the lab into clinical studies and, given the CUNY report, some scientists are now calling for the two ongoing trials to be suspended.

58.     The *Science* Article also discussed how the investigative committee uncovered

clear examples of data manipulation, stating, in relevant part:

> The investigative committee found numerous signs that images were improperly manipulated, for example in a 2012 paper in *The Journal of Neuroscience* that suggested simufilam can blunt the pathological effects of beta amyloid, a protein widely thought to drive Alzheimer's disease. It also concluded that Lindsay Burns, Cassava's senior vice president for neuroscience and a co-author on several of the papers, bears primary or partial responsibility for some of the possible misconduct or scientific errors.

59.     The *Science* Article further highlighted that Dr. Wang failed to produce any of his

original raw data, stating:

> The committee could not prove its suspicions, however, because Wang did not produce the original raw data. Instead, the panel says its finding of wrongdoing was based on "long-standing and egregious misconduct in data management and record keeping by Dr. Wang."
>
> The 50-page report obtained by *Science* says the scientist failed to turn over to the panel "even a single datum or notebook in response to any allegation" and cites "Wang's inability or unwillingness to provide primary research materials to this investigation" as a "deep source of frustration."

60.     Additionally, the *Science* Article discussed why CUNY launched an investigation

into Dr. Wang, stating, in relevant part:

> The CUNY investigation into Wang began in the fall of 2021, in response to allegations from other investigators that were forwarded by the Office of Research Integrity (ORI), the federal entity that oversees work funded by the National Institutes of Health. NIH provided millions of dollars for work by Wang and Burns, including about $1.2 million to Wang since December 2020. The investigation was not completed until this year, in May, according to emails obtained by *Science*. The four-member investigative panel of researchers, led by CUNY neuroscientist Orie Shafer, encountered delays beyond its failed efforts to obtain raw data from Wang. For 6 months, university officials stonewalled the panel's requests for image files confiscated from Wang's computers, according to the report. The investigators received the files only after appealing directly to Vincent Boudreau, president of

CCNY.

61.     The *Science* Article also cited a colleague of Dr. Wang, stating:

CUNY biochemist Kevin Gardner, who helped prepare a preliminary assessment of Wang's work but was not involved in the final review, calls what the panel found "embarrassing beyond words." Wang's record of research is "abhorrent," he says. That this work has supported clinical trials, Gardner adds, "makes it doubly sickening."

62.     The *Science* Article further discussed the consequences of the investigation, stating, in relevant part:

*The CUNY investigators recommended that journals retract the Wang papers they had probed if he can't provide original data.* Multiple journals have already done so, after Schrag notified them of his findings*. The investigators noted that PLOS ONE, which retracted five of Wang's papers, "discovered evidence of research misconduct in his response to the concerns raised."* Other journals, including *The Journal of Neuroscience*, posted corrections or expressions of concern on Wang papers, with some editors saying they were waiting for CUNY's investigation before taking further steps.

63.     Following this news, Cassava's stock price fell $2.68 per share, from $17.34 per share at market close on October 12, 2023 to $14.86 per share at market close on October 13, 2023, amounting to a 15.28% decline.

### *DAMAGES TO CASSAVA*

64.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has lost and will continue to lose and expend many millions of dollars.

65.     Such losses include compensation paid to Individual Defendants pursuant to the Compensation Program.

66.     Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against Cassava and the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection

thereto.

67.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to Cassava.

68.     As a direct and proximate result of the Individual Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague Cassava's stock in the future due to Cassava's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

69.     Plaintiff brings this action derivatively and for the benefit of the Company to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of the Company, violations of the Exchange Act, and the aiding and abetting thereof.

70.     The Company is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

71.     Plaintiff is, and has been at all relevant times, a shareholder of the Company. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

72.     Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

73.     A pre-suit demand on the Board of the Company is futile and, therefore, excused.

At the time of filing of this action, the Board consists of the following nine individuals: Defendants Barbier, Barry, Gussin, O'Donnell, Robertson, and Scannon (the "Director-Defendants"), and nonparties Robert Anderson, Jr., Pierre Gravier, and Claude Nicaise (collectively with the Director-Defendants, the "Directors"). Plaintiff only needs to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

74. Demand is excused as to each of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause Cassava to make and/or cause Cassava to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

75. Completely abdicating their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make Cassava appear more profitable and attractive to investors during the Relevant Period. Moreover, the Director-Defendants caused Cassava to fail to maintain internal controls. Consequently, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

76. **Defendant Barbier** - Defendant Barbier has served as Cassava's CEO, President, and Chairman of the Board since founding Cassava in May 1998. Thus, as Cassava has admitted, he is a non-independent director. Additionally, Cassava provides Defendant Barbier with his principal occupation for which he receives substantial compensation, as previously discussed. As CEO, President, and Chairman of the Board, Defendant Barbier was ultimately responsible for all the false and misleading statements and omissions that were made during the Relevant Period,

including the statements he personally made in numerous press releases during the Relevant Period and the statements in the 10-K 2022, which he signed both the document and the attached SOX certifications for. In addition, the 2023 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to shareholders approving, on an advisory basis, his unjust compensation and caused the re-election of Defendants Gussin and Barry to the Board, allowing them to continue to breach their fiduciary duties to Cassava. As Cassava's highest officer and as trusted Chairman of the Board, he conducted little, if any, oversight of the scheme to cause Cassava to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Barbier is a defendant in the Class Action. For these reasons, Defendant Barbier breached his fiduciary duties owed to Cassava, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

77. **Defendant Barry** - Defendant Barry has served as a director of Cassava since June 2021. As a member of the Board, Defendant Barry serves as the Chair of the Audit Committee and of the Nominating and Governance Committee. Defendant Barry signed, and thus personally made, the false and misleading statements contained in the 10-K 2022. Additionally, the 2023 Proxy Statement, which contained false and misleading statements, was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board and shareholders approving the Compensation Program. These approvals allowed Defendant Barry to continue to breach his fiduciary duties and obtain material benefits, as the Compensation Program now entitles Defendant Barry to (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of Cassava common stock; (3) an annual

nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Cassava common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of Cassava common stock for service on one committee or 5,000 shares of Cassava common stock for service on two or more committees. As a trusted director of Cassava, he conducted little, if any, oversight of the scheme to cause Cassava to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Barry breached his fiduciary duties to Cassava, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

78.     **Defendant Gussin** - Defendant Gussin has served as a director of Cassava since March 2003. He also serves as a member of both the Audit Committee and the Compensation Committee. Defendant Gussin signed, and therefore personally made, the false and misleading statements contained in the 10-K 2022. Moreover, the 2023 Proxy Statement, which contained false and misleading statements, was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board and shareholders vote to approve the Compensation Program. Such approvals allowed Defendant Gussin continue to breach his fiduciary duties and to reap material benefits, as the Compensation Program now entitles Defendant Gussin to (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of Cassava common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Cassava common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of Cassava common stock for service

on one committee or 5,000 shares of Cassava common stock for service on two or more committees. As a trusted director of Cassava, he conducted little, if any, oversight of the scheme to cause Cassava to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and also consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gussin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

79.     **Defendant O'Donnell** - Defendant O'Donnell has served as a director of Cassava since June 1998. Defendant O'Donnell signed, and therefore personally made, the false and misleading statements contained in the 10-K 2022. Moreover, the 2023 Proxy Statement, which contained false and misleading statements, was solicited on his behalf, and the false and misleading statements contained therein contributed to shareholders approving the Compensation Program and caused the re-election of Defendants Gussin and Barry to the Board, allowing them to continue to breach their fiduciary duties to the Company. These approvals allowed Defendant O'Donnell to obtain material benefits, as the Compensation Program now entitles Defendant O'Donnell to (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of Cassava common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Cassava common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of Cassava common stock for service on one committee or 5,000 shares of Cassava's common stock for service on two or more committees. As a trusted director of Cassava, he conducted little, if any, oversight of the scheme to cause Cassava to make false and misleading statements, consciously disregarded his duties to monitor internal

controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant O'Donnell breached his fiduciary duties to Cassava, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

80. **Defendant Robertson** - Defendant Robertson has served as a director of Cassava since September 1998. He also serves as a member on each of the Audit Committee, the Compensation Committee, and Nominating and Governance Committee. Defendant Robertson also serves as Lead Director. Defendant Robertson signed, and thus personally made, the false and misleading statements contained in the 10-K 2022. Moreover, the 2023 Proxy Statement was solicited on his behalf and the false and misleading statements contained therein contributed to shareholders approving the Compensation Program and caused the re-election of Defendants Gussin and Barry to the Board, allowing them to continue to breach their fiduciary duties to Cassava. Such approvals allowed Defendant Robertson to reap material benefits, as the Compensation Program now entitles Defendant Robertson to (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of Cassava common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Cassava common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of Cassava's common stock for service on one committee or 5,000 shares of Cassava common stock for service on two or more committees. As a trusted director of Cassava, he conducted little, if any, oversight of the scheme to cause Cassava to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For

these reasons, Defendant Robertson breached his fiduciary duties to Cassava, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

81. **Defendant Scannon** - Defendant Scannon has served as a director of Cassava since December 2007. During the Relevant Period, he also served as a member of the Audit Committee. Defendant Scannon signed, and thus personally made, the false and misleading statements contained in the 10-K 2022. Moreover, the 2023 Proxy Statement, which contained false and misleading statements, was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board and shareholders approving the Compensation Program. Such approvals allowed Defendant Scannon to continue to breach his fiduciary duties to Cassava and to reap material benefits as the Compensation Program now entitles Defendant Scannon to (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of Cassava common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares of Cassava common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of Cassava common stock for service on one committee or 5,000 shares of Cassava common stock for service on two or more committees. As a trusted director of Cassava, he conducted little, if any, oversight of the scheme to cause Cassava to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Scannon breached his fiduciary duties to Cassava, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

82. Additional reasons that demand on the Board is futile follow.

83. Director-Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon solicited shareholders in the 2023 Proxy Statement to vote approve Cassava's Compensation Plan, from which they each materially benefited and will continue to benefit. Director-Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon were all well-aware of and had access to non-public information regarding the Company's research and the prevalent issues associated with it. If not for the false and misleading statements throughout the Relevant Period and for the false and misleading elements in the 2023 Proxy Statement, the Company's shareholders would not have voted to approve the Compensation Program and reelect Defendants Barry and Gussin to the Board. Accordingly, the Individual Defendants materially benefited as a result of the scheme to cause Cassava to make false and misleading statements. Under the Compensation Program, Director-Defendants Barry, Gussin, O'Donnell, Robertson and Scannon are now entitled to (1) a $10,000 annual retainer; (2) an initial nonqualified stock option grant for the right to purchase 20,000 shares of Cassava common stock; (3) an annual nonqualified stock option grant at the annual stockholder 2024 and 2025 meetings for the right to purchase 5,000 shares Cassava common stock; and (4) an additional nonqualified stock option grant on the data of the Annual Meeting for the right to purchase 2,500 shares of Cassava common stock for service on one committee or 5,000 shares of Cassava common stock for service on two or more committees. Director-Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon are collectively entitled to $150,000 and $245,000 in shares and options. Such awards provide material benefits to Director-Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon that render each of them incapable of evaluating a demand with disinterestedness. Thus, Director-Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon would be incapable of consider any demand

challenging Cassava's Compensation Program or their own involvement in the scheme to cause Cassava to issue materially false and misleading statements and related claims. As a result of the foregoing, Director-Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

84.     The Director-Defendants have long-term business and personal relationships with each other and the Individual Defendants that preclude each of them from acting independently and in the best interests of Cassava and the shareholders. Additionally, Defendants Barbier, O'Donnell, and Robertson, have all worked together at Cassava for over two decades, since they joined in 1998, with Defendant Gussin working with them for almost that long having joined in 2003. Furthermore, Director-Defendant Scannon has worked with Director-Defendants Barbier, O'Donnell, Robertson, and Gussin at the Company for over a decade, with Director-Defendant Scannon joining in 2007. These clear conflicts of interest prevented the Director-Defendants from adequately monitoring Cassava's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

85.     Director-Defendants Barry, Gussin, and Robertson (the "Audit Committee Defendants") all served as members of Cassava's Audit Committee during the Relevant Period. Pursuant to Cassava's Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*, monitoring Cassava's system of internal controls, reviewing their adequacy on an ongoing basis, and recommending to the Board remedies to any identified deficiencies. The Audit Committee Defendants failed in adequately overseeing Cassava's internal controls, failed to identify or remedy deficiencies with Cassava's internal controls, and therefore failed to prevent Cassava from issuing false and misleading statements to the public and the SEC. Therefore, the

Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

86. Defendants Gussin and Robertson (the "Compensation Committee Defendants") also served as members of Cassava's Compensation Committee throughout the Relevant Period. As stated in the 2023 Proxy Statement, "[t]he Compensation Committee reviews and recommends to the Board of Directors the salaries, incentive compensation and benefits of the Company's officers and administers the Company's stock plans and employee benefit plans." The Compensation Committee Defendants therefore reviewed and recommended to the Board the salaries, incentive compensation, and benefits of the Individual Defendants, and also awarded them compensation under Cassava's stock plans. This compensation was unjust in light of the Individual Defendants'—including the Compensation Committee Defendants'—violations of law. Consequently, the Compensation Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

87. In violation of Cassava's Code of Ethics, the Director-Defendants conducted little, if any, oversight of Cassava's engagement in the Individual Defendants' scheme to cause Cassava to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants: (i) failed to act with honesty and integrity; (ii) failed to provide the SEC and public with complete, fair, accurate, timely, and understandable disclosures; (iii) failed to comply with applicable laws and regulations; (iv) failed to act in good faith, responsibly with due care and diligence and without misrepresentation or omission of material facts; failed to promote ethical behavior at Cassava; and

(v) failed to promptly report violations of the Code of Ethics. Therefore, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

88.     The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, however the Directors have failed to file any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages the Company suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

89.     The Individual Defendants' conduct described herein and summarized above could not have been the product of sound and reasonable business judgment, as it was based on bad faith and intentional, reckless, or disloyal misconduct. Therefore, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to Cassava's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of Cassava. Accordingly, demand is excused as being futile.

90.     The acts complained of herein amount to violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

91.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused Cassava to purchase it for their own protection with corporate funds, i.e., monies belonging to the stockholders of the Company. If there is a directors' and officers' liability insurance policy covering the Directors, this policy may contain provisions that eliminate coverage for any action brought directly by Cassava against the Directors, known as,

*inter alia*, the "insured-versus-insured exclusion." Consequently, if the Directors were to sue the Director-Defendants or certain of the officers the Company, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. Conversely, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for Cassava to effectuate a recovery. Therefore, demand on the Directors is futile and, therefore, excused.

92.     If there is no directors' and officers' liability insurance, then the Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Therefore, demand is futile in that event, as well.

93.     For all of the reasons set forth above, each of the Directors, and if not all of the Directors, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

94.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

95.     Each director and officer of Cassava owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of Cassava and in the use and preservation of its property and assets and the highest obligations of fair dealing. The Individual Defendants, because of their positions of control and authority as directors and/or

officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of Cassava.

96.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Cassava and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of Cassava, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to Cassava and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Cassava. The conduct of the Individual Defendants who were also the officers and directors of Cassava has been ratified by the remaining Individual Defendants who collectively comprised a majority of the Company's Board at all relevant times.

97.     As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to Cassava's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding Cassava's business, prospects, and operations, and had a duty to cause Cassava to disclose in its regulatory filings with the SEC all those facts described in this Complaint

that it failed to disclose, so that the market price of Cassava's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure Cassava remained in compliance with all applicable laws.

98. To discharge their duties, the officers and directors the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of Cassava. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that Cassava was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Cassava Sciences' Code of Ethics;

(b) conduct the affairs of Cassava in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting Cassava's assets, and to maximize the value of Cassava's stock;

(c) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with

all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and Cassava's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by Cassava's officers and employees and any other reports or information that Cassava was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Cassava insiders at the expense of Cassava; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of Cassava and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

99. Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of Cassava and refrain from using their position, influence, or knowledge of the affairs of Cassava to gain personal advantage.

100. At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

101. Because of their advisory, executive, managerial, directorial, and controlling positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about Cassava.

102. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## FIRST CLAIM

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

103.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

104.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

105.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

106.    Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose, *inter alia*: (1) contrary to the 2023 Proxy Statement's descriptions of the Board's risk oversight function and Cassava's Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting Cassava to issue false and misleading statements to the investing public, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board who were breaching their fiduciary duties were improperly interested in increasing

their unjust compensation by seeking shareholder approval of Non-employee Director Compensation Program, which the Individual Defendants serving on the Compensation Committee were improperly administering by rewarding misconduct.

107. Additionally, the 2023 Proxy Statement further failed to disclose that: (1) Cassava failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) as a result, Cassava's published data that supported simufilam's efficacy was susceptible to manipulation and had overstated simufilam's efficacy and simufilam's clinical and/or commercial prospects; (3) as a further result of the foregoing, Cassava was subject to high risks of substantial financial and reputational harm; (4) Cassava failed to maintain adequate internal controls; and (5) as a result all of the foregoing, Cassava's public statements were materially false and misleading at all times.

108. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to: (i) the reelection of Defendants Barry and Gussin to the Board; (ii) approving the Compensation Program; (iii) ratifying EY as independent auditor Fiscal Year 2023; (iv) and the approval, on an advisory basis, of Defendants Barbier's and Schoen's compensation.

109. The false and misleading elements of the 2023 Proxy Statement led to, among other things, the reelection of the Defendants Barry and Gussin, which allowed them to continue to breach their fiduciary duties to Cassava. The false and misleading elements of the 2023 Proxy Statement also led Cassava's shareholders to approve, on an advisory basis, Defendants Barbier's,

and Schoen's compensation. In addition, the false and misleading elements of the 2023 Proxy Statement resulted in the breaching non-employee Directors, namely Defendants Barry, Gussin, O'Donnell, Robertson, and Scannon, in being compensated by Cassava.

110.     Cassava was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

111.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

112.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

113.     Each Individual Defendant owed to Cassava the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

114.     Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

115.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to Cassava, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

116.     In breach of their fiduciary duties owed to the Company, the Individual Defendants willfully or recklessly made and/or caused Cassava to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Cassava failed to maintain adequate and effective data management controls and procedures for its drug research programs; (2) as a result, Cassava's published data that supported simufilam's efficacy was

susceptible to manipulation and had overstated simufilam's efficacy and simufilam's clinical and/or commercial prospects; (3) as a further result of the foregoing, Cassava was subject to high risks of substantial financial and reputational harm; (4) Cassava failed to maintain adequate internal controls; and (5) as a result all of the foregoing, Cassava's public statements were materially false and misleading at all times.

117. The Individual Defendants further failed to correct and/or caused Cassava to fail to correct the false and misleading statements and omissions of material fact, which renders them personally liable to Cassava for breaching their fiduciary duties.

118. Also in breach of their fiduciary duties, the Individual Defendants caused Cassava to fail to maintain internal controls.

119. The Individual Defendants had actual or constructive knowledge that they had caused Cassava to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that Cassava was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused Cassava to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

120. These actions were not a good-faith exercise of prudent business judgment to protect and promote Cassava's corporate interests.

121.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to Cassava.

122.    Plaintiff on behalf of the Company has no adequate remedy at law.

## THIRD CLAIM

### Against Defendants Barbier and Schoen for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

123.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

124.    The Company, Defendant Barbier, and Defendant Schoen are all named as defendants in the Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when Cassava is found liable in the Class Action for these violations of the federal securities laws, Cassava's liability will be in whole or in part due to Defendants Barbier's and Schoen's willful and/or reckless violations of their obligations as officers and/or director of the Company.

125.    Defendants Barbier and Schoen, because of their positions of control and authority as CEO and Chairman, and CFO, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Class Action.

126.    Accordingly, Defendants Barbier and Schoen are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

127.    As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Barbier and Schoen.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in Cassava's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of the Company, and that Plaintiff is an adequate representative of Cassava;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to the Company;

(c)    Determining and awarding to the Company the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing the Company and the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to Cassava's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of the Company to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding the Company restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

April 4, 2024

                                        Respectfully Submitted,

                                        **THE BROWN LAW FIRM, P.C.**

                                        */s/    Timothy Brown*
                                        Timothy Brown
                                        767 Third Avenue, Suite 2501
                                        New York, NY 10017
                                        Telephone: (516) 922-5427
                                        Facsimile: (516) 344-6204
                                        Email: tbrown@thebrownlawfirm.net

                                        *Liaison Counsel*

                                        **BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

                                        Peretz Bronstein
                                        Eitan Kimelman
                                        60 East 42nd Street, Suite 4600
                                        New York, NY 10165
                                        Telephone: (212) 697-6484
                                        Facsimile: (212) 697-7296
                                        Email: peretz@bgandg.com
                                                eitank@bgandg.com

*Counsel for Plaintiff*

# CIVIL COVER SHEET

The ILND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(See instructions on next page of this form.)*

## I. (a) PLAINTIFFS

JOSE GARZA, derivatively on behalf of CASSAVA SCIENCES, INC.

## DEFENDANTS

REMI BARBIER, ERIC J. SCHOEN, RICHARD J. BARRY, ROBERT Z. GUSSIN, MICHAEL J. O'DONNELL, SANFORD R. ROBERTSON, and PATRICK J. SCANNON, and CASSAVA SCIENCES, INC, Nominal Defendant.

**(b)** County of Residence of First Listed Plaintiff
*(Except in U.S. plaintiff cases)*

*(In U.S. plaintiff cases only)*
Note: In land condemnation cases, use the location of the tract of land involved.

**(c)** Attorneys *(firm name, address, and telephone number)*

The Brown Law Firm, P.C., 767 Third Avenue, Suite 2501, New York, NY, 10017; (516) 922-5427; Bronstein, Gewirtz & Grossman, LLC, 60 East 42nd Street, Suite 4600, New York, NY 10165, (212) 697-6484

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Check one box, only.)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government not a party.)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate citizenship of parties in Item III.)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(For Diversity Cases Only.)*

*(Check one box, only for plaintiff and one box for defendant.)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business in This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Check one box, only.)*

| CONTRACT | TORTS | PRISONER PETITIONS | LABOR | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 510 Motions to Vacate Sentence | [ ] 710 Fair Labor Standards Act | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 530 General | [ ] 720 Labor/Management Relations | [ ] 376 Qui Tam (31 USC 3729 (a)) |
| | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | [ ] 535 Death Penalty | | [ ] 400 State Reapportionment |
| [ ] 130 Miller Act | [ ] 320 Assault, Libel & Slander [ ] 330 Federal Employers' Liability | | [ ] 740 Railway Labor Act | [ ] 410 Antitrust |
| [ ] 140 Negotiable Instrument | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | **Other:** | [ ] 751 Family and Medical Leave Act | [ ] 430 Banks and Banking |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 345 Marine Product Liability [ ] 350 Motor Vehicle | | [ ] 540 Mandamus & Other [ ] 550 Civil Rights | [ ] 790 Other Labor Litigation | [ ] 450 Commerce [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 355 Motor Vehicle Product Liability | **PERSONAL PROPERTY** | [ ] 555 Prison Condition [ ] 560 Civil Detainee - Conditions of Confinement | [ ] 791 Employee Retirement Income Security Act | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loan (Excludes Veterans) | [ ] 360 Other Personal Injury [ ] 362 Personal Injury - Medical Malpractice | [ ] 370 Other Fraud | | | [ ] 480 Consumer Credit |
| | | [ ] 371 Truth in Lending | | **PROPERTY RIGHTS** | [ ] 485 Telephone Consumer Protection Act (TCPA) |
| [ ] 153 Recovery of Veteran's Benefits | | [ ] 380 Other Personal Property Damage | | [ ] 820 Copyright [ ] 830 Patent | |
| [x] 160 Stockholders' Suits | | | | [ ] 835 Patent - Abbreviated New Drug Application | [x] 490 Cable/Sat TV [x] 850 Securities/Commodities/ Exchange |
| [ ] 190 Other Contract [ ] 195 Contract Product Liability [ ] 196 Franchise | | [ ] 385 Property Damage Product Liability | | [ ] 840 Trademark [ ] 880 Defend Trade Secrets Act of 2016 (DTSA) | [ ] 890 Other Statutory Actions [ ] 891 Agricultural Arts |

| REAL PROPERTY | CIVIL RIGHTS | BANKRUPTCY | FORFEITURE/PENALTY | SOCIAL SECURITY | |
|---|---|---|---|---|---|
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | [ ] 422 Appeal 28 USC 158 | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 861 HIA (1395ff) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 423 Withdrawal 28 USC 157 | [ ] 690 Other | [ ] 862 Black Lung (923) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | | | [ ] 863 DIWC/DIWW (405(g)) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/Accommodations | **IMMIGRATION** | | [ ] 864 SSID Title XVI | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/ Disabilities- Employment | [ ] 462 Naturalization Application | | [ ] 865 RSI (405(g)) | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | [ ] 463 Habeas Corpus – Alien Detainee (Prisoner Petition) | | **FEDERAL TAXES** | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 465 Other Immigration Actions | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) [ ] 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Check one box, only.)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District (specify)
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

( Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

(15 U.S.C. § 78n(a)(1))

## VII. PREVIOUS BANKRUPTCY MATTERS

(For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)

## VIII. REQUESTED IN COMPLAINT:

- [ ] Check if this is a **class action** under Rule 23, F.R.CV.P.

Demand $

CHECK Yes only if demanded in complaint:
Jury Demand: [x] Yes  [ ] No

## IX. RELATED CASE(S) IF ANY *(See instructions):*

Judge John F. Kness

Case Number 1:24-cv-02223

## X. Is this a previously dismissed or remanded case?

[ ] Yes  [ ] No  If yes, Case #  Name of Judge

Date: 4-4-2024 _____

Signature of Attorney of Record /s/ Timothy Brown

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority for Civil Cover Sheet

The ILND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use

**(b)**  **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the

**(c)**  **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here. United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box. Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**  **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**  **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: <u>Nature of Suit Code Descriptions</u>.

**V.**  **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**  **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**  **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

## **VERIFICATION**

I, Jose Garza, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31st day of March, 2024.

DocuSigned by:

_____
Jose Garza